We will hear argument next in No. 16-1352, Novartis against Torrent. Before you get started and before the clock starts, I would like to ask the parties after this argument to review the confidentiality designations in the joint appendix, try to review our portions as they certainly appear to us to be, that do not now, if they ever did, need confidentiality designations. There appear to be whole filings in the PTO in which you set out the proposed amendments and arguments that do not seem to need confidentiality designations and try to agree on what such material might be declassified, if I can use that word, and let us know in any way that you think is suitable. And we do not plan to adjudicate disputes about this. Understood, Your Honor. Yes, and we will, of course, do that, Your Honor. Good morning, and may it please the Court. My name is Robert Trencher. I'm from Gibson, Dun and PTAB's decision in validating a patent on the formula for Jelenia, the world's first approved solid oral medication for multiple sclerosis. As the briefs show, the Board made several legal errors, but I'd like to focus my time today on the Board's failure to provide the notice and chance to be heard required by the APA on the reference that really was the centerpiece of their final written decision, the Sakai patent. In addition, if time permits, I would like to address how the Board handled the nexus issues with respect to secondary indicia, but we'll see if we get there. The Sakai patent covered a liquid formula that contains the same active ingredient as Jelenia. It's called Fingolimod, and it was designed to be injectable primarily, although... We are familiar with the reference. Thank you. I'll really presume that and just jump into why it is that you should have a remand down to the Board when, in fact, Sakai was discussed in briefing and at the oral argument before the Board. Yes, Your Honor. So after the Board's institution decision, it found, of course, that Sakai was inapplicable to the solid formula that's in R-283 patent. That was their word, inapplicable, because you don't look to a liquid to make a solid. Based on that decision, they ordered... Sorry, they rejected two Sakai-based proposed grounds in the petition, and they ordered the parties in an equitable paragraph the institution decision. One was just based on Sakai alone, right? Right. One was anticipation. My understanding is the Board said, well, we're not going to institute on a 102 since the Sakai reference is a liquid formulation, and as we understand the claim, it's calling for a solid. So it can't be a 102. Correct. But that doesn't speak to why it can't be used as a possible basis for combining Chiba and Alton. However, with respect to the 103 ground that was proposed, it was a combination of Sakai and Chiba. And in that discussion, the Board in the institution decision said that Sakai as a liquid is inapplicable to a solid, and the reason is pretty straightforward. Let me just quote it, because it seems to me that the thing in the Board decision that you rely on for what makes this case at least possibly distinctive. This is on Appendix 72, page 13 of the Board's opinion. Sakai's stated reasons for using Manitoulin in liquid pharmaceutical compositions are inapplicable to its potential use in connection with solid pharmaceutical compositions. And as I understand your argument in its most pointed form is you were entitled to rely on that as essentially a binding Board disposition of a factual proposition wherever that factual proposition might be used, including in the ground on which the IPR was instituted, Chiba plus Alton. Chiba plus Alton, yes, Your Honor. So I would modify what Your Honor said slightly in that we view it as law of the case. So we did think the Board, if it wanted to— I went on the computer and looked, and at least I did not find any IPR Board reference ever to law of the case. Yes, Your Honor. This is a sui generis group of facts. We have never seen a situation in which the Board makes an affirmative finding at the institution stage that results in final non-appealable action. How would this work in a district court, say, in a preliminary injunction proceeding, where on a limited record the district court says, I don't think that this is relevant to this other thing. A is not relevant to B. Would law of the case apply in the trial? I understand there are different procedural rules, but would that apply to essentially require the special high standards that law of the case triggers for changing a court's mind? In a preliminary injunction context in district court, all those findings are quite expressly preliminary. But why aren't all of these quite implicitly? Well, it's much like the SAS case, Your Honor. In the SAS case, right, which was earlier this year, in which this court found that a Board determination on claim construction at the institution stage that the Board then switched in the final written decision was a problem because the parties had relied on the claim construction. Isn't that in that case is different, though? The parties relied on it, but they also – the Board changed that construction, and the parties had argued over it. They didn't have notice that the Board was going to change that construction, whereas here it seems to me that it might be different in that the parties in this case seem to have discussed in great detail in different briefings exactly whether Sakai is support for the combination that the Board was examining. That's actually not correct, Your Honor. We did not do that. What we did is we took the Board's decision as given, and to the extent Sakai came up in subsequent proceedings, which it did, we put in basically the same conclusory point that the Board had. We did not develop the record as we would have, and as the Board found actually was missing. One of the strange things about this case is – Didn't Dr. Byrne provide a declaration that – He did. He did on the other side's theories on why, in their view, Sakai was relevant to a combination of Chiba and Alton, and then Dr. Byrne tried to explain away why that's not necessarily so. Dr. Byrne submitted two declarations. We're talking about the second one. Okay, so the patent owner, of course, in this sort of proceeding, has one shot to put in an affirmative case that's not rebuttal, and that's with the patent owner's opposition and with the motion to amend going at the same time. That is our only chance to put in affirmative evidence. The other side, on the motion to amend – So what Judge Shen was describing, was he describing something – On the motion to amend. That's about the motion to amend, correct. That is a reply declaration on the motion to amend alone. That's entirely what it was about. And even there, to the extent it addresses this question of whether a reasonable formulator at the time would look to this Sakai patent, this liquid, in order to make a solid, if you read the declaration, all it does is parrot what the board had already found, which is you wouldn't do that because the ingredients in Sakai, mannitol that overlaps with the ingredient in our patent, are used for completely different reasons. In Sakai patent, mannitol is used to alleviate injection site irritation. That's obviously not an issue when you put a pill in your mouth. You don't have any injection site irritation. So you wouldn't look to mannitol as used in a liquid to make a solid. No, to me it looks like 830 to 837 says more than just parroting the sentence from the institution decision. He doesn't quote the sentence, Your Honor. It's all about a formulator would not refer to Sakai to make a solid oral formulation of the column. Exactly, Your Honor, which is the conclusion that the board had reached at the beginning. And the reasoning he uses is exactly the same reasoning that the board used in its institution decision. He did not go into any more depth. At, frankly, the motion to amend stage on the reply, he wasn't allowed to go into any more depth at that point in time. Under the rules, if we had tried to introduce anything new about why a formulator wouldn't look to Sakai when making our solid formula, the whole reply would have been subject to being struck under the board's rules, the entire reply, because the board says we're not going to parse what's new versus what's not new. Of course, the other side did not move to strike because we introduced nothing new in those paragraphs. Can I try to define what you argue is distinctive? But put aside that one sentence, which I read earlier, and let's pretend that doesn't exist. And so the board's institution decision says we're not going to institute anticipation by Sakai. We're not going to institute 103 Chiba plus Sakai. There had been reference in the petition to, let's call it, background use of Sakai for the Chiba plus the other one. Alton. At that point, would you have any argument that the board couldn't rely on Sakai as part of the background for deciding whether there was motivation to combine Chiba and Alton? In this instance, Your Honor, given how Sakai was actually used, it was not used as background art. When you read the final decision, it's Sakai directly teaches, directly instructs. That's a primary reference that should be in what used to be called the count and is now called the graph. But it's one of four or five. It's in a passage where the board says here are a variety of reasons that we think somebody would, in fact, have looked to Alton to use Chiba. What the board does is first it looks at the two instituted references, Chiba and Alton. And it says those together would give rise to a motivation to test, to look at, but not actually use it. And we had a whole bunch of fighting below about how that's just an obvious to try argument in the context where that can't apply. That's the first finding. The next page, we turn the page, and it talks about all of Sakai. Sakai is the missing link that they rely on for motivation to combine. And under the Biderman case, that changed the entire thrust of the proceeding right there. And that is our fundamental problem with how they use Sakai. So our view is that the inapplicable language... And how your argument would be the same even if the board had not had that sentence that's actually said inapplicable, wouldn't that be a problem under the recent Genzyme case? Our argument is stronger because the inapplicable language was there, but we would still have and still make the argument that they ended up using Sakai as a primary reference when it wasn't a ground that was instituted. I think this is quite different than Genzyme, Your Honor. In Genzyme, there was no reference at the institution stage to the in vivo papers that ended up getting injected into that case. Then the patent owner, in his opposition, introduced those, but then said you can't look at them instead of dealing with them substantively. And I think the court rightly said, you had notice. You brought them into the proceeding. You could use them. That is a very different context here. Here, we had a finding at the beginning, and in order to limit our presentation to the references that were instituted, and Sakai had been excluded not once but twice, on a 102 and a 103 basis. Well, Sakai had been excluded. I'm not quite sure what that means. There are two grounds of alleged invalidity that included Sakai on which the board didn't institute. But am I wrong that the petition relied in part on Sakai in the ground, in its argument for the ground on which the proceeding was instituted? That's a very interesting question, Your Honor. We addressed this in our reply brief. The petition cited Sakai on the reasonable expectation of success question, not a motivation to combine Chiba and Alton. So it was a completely different issue than the issue on which the board seized on it and used it in the final decision. So even relying on the petition, I would argue that given the board's finding in the institution decision, whatever the petition said about Sakai has to be viewed in light of what the board thought of it at the institution stage. But even if you look at the petition, Sakai was in the reasonable expectation of success analysis, not in the motivation to combine analysis. I do see I'm eating very much into my rebuttal time. If you have something else you want to talk about briefly, go ahead. I will reserve. You won't lose your time. Oh, I appreciate it, Your Honor. I think we've touched on all the key parts about Sakai. The most important thing is we would have put in an affirmative case if we had known Sakai was a live issue. The board itself identifies the type of analysis that we would have done if we had known Sakai was a live issue, rather than simply putting in conclusory points based on the board's initial finding. We would have, for instance, in this article by Dr. Byrne, explained why the active ingredient fengalimod was a very poor candidate for being extrapolated in its liquid form to a formula in its solid form. There was a quote in the Alton reference, the instituted reference, in which that formulator that they were relying on, Mr. Alton or Dr. Alton, says you can't, his words, glibly extrapolate formulas created in a solution to a solid form. So their own reference was describing what Dr. Kent, their expert, was doing as glibly. We would have brought that sort of information out. We would have looked at other literature as to why you don't do this sort of thing, and we never had that chance, and we're just asking for that opportunity when we can hopefully go back. That's it, Your Honor. Okay, thank you. Restore the rebuttal time. Ms. Wray. Thank you. Good morning, Your Honors. I'm Terry Wray. I'm with Crowley-Mooring, and I'm arguing on behalf of petitioners today. I believe that what is at issue right now is the decision by the patent trial and appeal board and their determination of the claims of the 283 patent were unpatentable because they claimed no more than an obvious combination of two ingredients in a solid oral formulation. Can you focus on this particular passage at Appendix 72 in the institution decision in which the board says Sakai's stated reasons for using mannitol in liquid pharmaceutical compositions are inapplicable to its potential use in connection with solid pharmaceutical compositions, and try to explain what we should make of that, why that was not, in effect, enough of a closing of that issue unless it were affirmatively reopened that Novartis could rely on it? Yes, Your Honor. So that particular passage I am very familiar with, and keep in mind that passage was made during the institution decision, and basically the only focus at that time was on the three grounds that petitioners had presented. You've already discussed them. One was a 102 and then two 103 grounds. So when they said it was inapplicable, it was inapplicable only for use as a primary anticipation or obviousness reference. The fact of the matter is at the institution – I guess I'm not sure that that really says that. This doesn't say that Sakai is inapplicable. It says that Sakai's stated reasons for using the mannitol in liquid are inapplicable to potential use in solid. That sounds like a factual finding, maybe not forever binding that precludes the board from changing its mind, but why isn't that enough to have allowed Novartis to rely on it unless they were given further notice with an opportunity to put on evidence? Let me see if I can put a finer point on it. A72, page 13 of the institution decision, as Judge Toronto points out, says the stated reasons for using mannitol in liquid is inapplicable to its potential use in a solid. And then A12, the board points out that Sakai contemplates the use of mannitol only for use in liquid pharmaceutical compositions. Sakai teaches using that results in a liquid composition further improved in irritation. And so I'm trying to figure out if the board is trying to say here that the reasons for using mannitol in liquid were to avoid irritation problems, and that suggested usage doesn't quite apply to a solid because you don't have to worry about that. But nevertheless, I'm trying to figure out if there's daylight between that and the ultimate usage of the Sakai reference as supporting this particular rejection. So I don't know if the PTAB made that decision based on the irritation problems, but I can tell you that their focus at the time was indeed just on establishing the grounds and the conditions. And if Judge Toronto, as you mentioned, if you took that as a factual determination that it's completely irrelevant, by the time we had the actual trial and we had a robust record, even one of Novartis's technical experts, Dr. Byrne, B-Y-R-N, he actually had an article. I sort of understand in the normal district court settings, you would say you have a preliminary proceeding, and then you go to the trial and both sides now have a full opportunity on whatever the current pleadings are to put on their evidence. The problem is that they go first after the institution decision. And the question is what is it that reasonably defines what they are supposed to put on affirmative evidence for because they are not at least entitled to another chance. And so the stuff that they tried to do after you came back and said Sakai, Sakai, Sakai, I'm making this up, that's not quite the opportunity. So when they had their first opportunity after the institution decision, keep in mind that also within one month after institution, two additional parties joined torrent. One of them was Apotex, one was Milan. They both accepted the Chiba-Alton ground for unpatentability, but they also mentioned Sakai as well as other background references in their analysis. It was months after that, after there were depositions, after patent owner had to provide their reply, and patent owner was on more than adequate opportunity or notice to know that Sakai is one of many background references and Novartis handled it in that fashion throughout the trial proceeding. Do you happen to have the citation at hand to the Apotex-Milan petition? My colleagues will. Thank you so much. Generally when parties join an earlier IPR proceeding, there is substantial duplication in the IPR itself. No, but I take it what you are suggesting is significant is that after the institution decision, there was another pleading to which they now had to respond that re-invoked Sakai in exactly the way that you then came to use it. That's correct, Your Honor. That's your point? It's just a page number. Appendix 20788. 20788? Yeah, to 89. Thank you. We believe that Novartis had plenty of opportunity to discuss Sakai in any way that they wished. Even during the oral proceedings, at the very beginning of their demonstratives, they put in two slides on Chiba, one slide on Alton, two slides on Sakai. They continuously referred to Sakai throughout all of their written proceedings where page limits are very precious and limited and valuable. What about their point that law and the case applies here, that that was a finding that they could rely on and that the PTAB can't change their mind? I don't think that the PTAB changed their mind. I think that their reliance, if indeed it was on that one sentence, was inappropriate because everybody knows that there are background references that are discussed during depositions as well as on papers and that background references help to add to the robustness of the case. And if that wasn't the case, we wouldn't have a trial that the institution decision would be the decision. Well, let me ask you this. You disagreed with whether the PTAB changed its mind. Let's just say they did. Let's say there really was a situation where they say something in the institution decision and they say something exact opposite in their final decision. But the parties argue about this finding anyway. I mean, does law and the case really apply? Because in district court, I don't think it would, and the reason why is because law and the case doesn't apply until there's an appeal. Someone fails to appeal, and then you end up going back on remand. So I'm just trying to figure out when would law and the case apply in the PTAB? Probably only after perhaps an appeal, as you indicated, but the fact of the matter is we don't have to arrive at that right now because Sakai, frankly, was not even necessary to supporting that ground and to focus on the unpatentability of the claims. If we didn't have Sakai in the case, which I almost regret now that we had brought it up, if we didn't need Sakai at all, I think we would have won no matter what. So now that we have Sakai in the case and it was always there as a background reference, now suddenly Novartis is saying, aha, because of that inapplicable language that Judge Toronto pointed out in the institution decision, that now somehow they did not have a full, robust opportunity to really build their record as to Sakai. I maintain that even if there's anything else they wanted to add to Sakai, it would either be inconsistent, redundant, or unnecessary to arrive at a different decision. If there was any problem here at all— But what in the board's decision would make it clear to us that the board thinks the same way you just said you think about how ultimately immaterial Sakai is? The board doesn't usually look at a reference and say it's irrelevant for the rest of the proceeding. When the board in their institution decision looks at references, it's only in terms of the grounds for unpatentability. They don't say, by the way, there's six other background references mentioned in the petition, and three of those we don't want to hear any more of in the proceeding. Because the board can't say that. They don't know that at that point. Right, but that's why I guess I keep focusing on that one sentence at Appendix 72, without which I think what you're just saying would track perfectly. But that's a bit of a bump in the road. That sounds, when you read it by itself, like the board is saying, this one we have made a factual determination about. But they didn't explicitly say that, and when we read it, we did not take it to be read as definitively as we never want to hear about this reference again. And likewise, Novartis did not interpret it in that fashion. Novartis kept using their precious page numbers on Sakai, and if they thought it wasn't part of the record, they wouldn't have done so. Novartis also had a wonderful opportunity in their motion to exclude toward the very end to make it clear what their feelings were or their impressions were on Sakai, especially with respect to that language that you had just provided. And they did not do so. So they had plenty of self-help opportunities throughout the entire trial to clarify the record, to bring it to the board's attention, and to let everybody know how they felt, and they did not do so. And even through the oral hearing, Sakai is mentioned throughout the record. And they never objected. If they really believed it, they would have said Sakai is not a reference we need to address at that time, and they failed to do so. I still have a few more minutes. Is there anything more that you would like to hear? Can you talk a little bit about what the board said about unexpected results, and in particular with reference to the several dependent claims that speak of certain concentrations of the active ingredient and the mannitol? And the board, if I recall, addressed that once kind of in general in going through the various non-art considerations and then also addressed it briefly in passing in discussing the motion to amend with respect to, I think, proposed claim 40 or something like that? Okay, yes, Your Honor. So the issue is low dose versus low concentration. And the issue as to low dose was first brought to the board's attention during the oral hearing. That was not something that was vetted significantly below. But even so, low concentration was never mentioned before the PTAB. Only once they decided to take their appeal did they carefully review the exact claims of the 283 patent. They noticed that some of the dependent claims referred to concentrations, and then they decided to use any argument they had as to low dose and try and fit it in the low concentration bucket. And that is not something that's possible, because even if you knew the concentration, you wouldn't know what the dose was. You need additional information, and in particular, you need to know the overall amount of material or the weight of the tablet. Right. Can I just, I mean, if you wouldn't mind, think about appendix page 43, which is also page 43 of the board's opinion, and that's where the board is discussing the proposed amendments, which would add claims 39, 40, and 54. And the board is there saying patent owners argue that these content limitations, which have to do with weight percents, and it uses the term that the patent owner argues that they were the first to discover that Fingalimod was difficult to formulate and had stability and content uniformity problems at low doses, and they cite to pages 4 and 5 the motion to amend, which would have been filed, if I remember right, a week before the patent owner's response. I think it was. It's the same time they filed their reply. It's concurrent with their reply. The motion to amend? Yes. Okay. So anyway, that's before the oral argument. Somebody is talking about low dose, or at least the board is understanding that somebody is having talked about low dose before the oral argument. And what about, just to add on here, page A2646, that's what I understand to be Novartis' expert's declaration, I think. In paragraph 18, they talk about changing proportions, not doses, but proportions, which I think is percentages, has normally no effect on degradation, except in the circumstances here. Doesn't that talk about percentages? It does talk about percentages, but you never heard about percentages below with the PTAB. It was always the low dose and the difficulty with low doses. Wasn't this document at A2646 submitted as part of the record at the PTAB? So what particular expert report was that, Your Honor? I believe that it was Novartis' expert. This is the Omura declaration? Oh, Omura? Omura. Okay. Mr. Omura's declaration was found, frankly, not to be reliable by the PTAB below, and so they did consider it. They did look at it, but they did not weigh that as a big factor when they were balancing the evidence before them. Mr. Omura had the Paragraphs Plus at oral hearing with Mr. Omura. The tables that were focused on by Novartis were very different tables than what they'd like to bring to the Board's attention now. They were very inconsistent with how they handled that, but both Mr. Omura, who's an inventor, and Mr. Pudipedi, another inventor, both of their testimony was not found to be as reliable as some of the other evidence of record. Okay. Thank you. I didn't mean to distract you from Judge Taranto's question, so he had other sites that he asked you about. I do have the red light, I just noticed, but I'm willing to entertain any other questions should you have them. Yeah. Let me just keep you for a moment. I just want to get these straight. So the motion to amend was filed April 3, 2015. I'm looking for, but I'm not finding immediately. I thought that the patent owner's response was filed a week later, April 10th. I think that was correct. Sorry, that was correct. So it wasn't actually at the reply stage. Yes, sorry. Almost immediately after. I mean, it was very early. And they expressly refer on page 7025 of the appendix, that's what's cited here, to low dose. It seems to me that that notion of low dose, maybe as a shorthand or I'm not sure what, in referring to the concentrations, was introduced in this proceeding well before the oral argument. Yes, that's correct. Okay. I guess I'm trying to figure out what is the character of the unexpected results argument that they actually presented to the board in the sense that were they really gunning for the claims that were directed to something with a low weight percentage of fingolimod or were they trying to make a different argument, which was surprisingly there's stability issues for other excipients when we have a low dosage. For mannitol, it's stable. For fingolimod, it's high percentage or low percentage. And so therefore, we want an unexpected results finding based across the entire range. That's how I look at the argument section of their motion to amend as well as the argument section of their patent owner response. I think that's correct, Your Honor, how I interpret it also. What's most relevant here is this entire discussion of low dose is irrelevant. Even during their motion to amend, they did not amend their claims to limit them to low dose. If you read the claim, claims 1 and 19, the independent claims in particular, they do the full range, high doses, medium doses, low doses. It's the entire range. What we're trying to figure out is the discussion and the fact section of these papers in reference to unexpected stability for low dosage when it comes to fingolimod is that a dog whistle for all of us to recognize we need to all run over to the dependent claims and look at the low weight concentration claims. No, Your Honor. So the low dose determination, the story behind it, so low dose to support that, they had Ms. Raine's, R-A-N-E's declaration during patent prosecution. She had one dose, 0.25 milligram, and she was not made available for deposition. So therefore, the PTAB did not rely on that extensively in their determination. Object, just to be clear, what was the evidence that they offered in support of unexpected results for low dose? Was it actually, I understand perfectly logically the distinction between dose and concentration. You could have an extremely high dose at a very low concentration if the pill were this big, but was there evidence about dose or about concentration? Or were they just using dose essentially as a bad shorthand for low concentration? I think they used dose as low dose because what really started it all is they had comparisons. What really started it all was they used fingolimod and they combined it with two ingredients that weren't necessarily compatible. So when they first did their stability studies, they had difficulty. They had carboxymethyl starch and another ingredient also with two other things. So when they first did their studies way back when, they had difficult times formulating it. So when they first decided, oh, we need a low dose fingolimod, it's not going to be this high dose, they went ahead and they took the same poor starch additives, the carboxymethyl starch and the other ingredient that was not found to be adequate, and they says, oh, we have stability issues here because it's the same low dose. In the low dose, we have stability issues, and aha, mannitol is no problem. But when they tried that, those two ingredients that they used, the carboxymethyl starch and another ingredient, were the two that they already knew didn't work. So when they started formulating the low dose, they added two excipients that they already knew were not stable that actually probably reacted with the fingolimod. There was never any testimony on that per se. And then what they did is when they finally got smart and they said you take the active ingredient and you do a binary combination, you try it against one excipient, guess which was the first excipient they chose? Mannitol. And it didn't have either one of those two defective or problem excipients, and they had low dose and they says, aha, this is the magic. The real magic when they did the low dose tablet is the fact that they didn't use those two other excipients that they were fully aware of didn't work. Okay, thank you. Can I ask you just one question about the Amora Declaration again? I thought that the board stated that it would not rely on certain paragraphs, but it denied the motion to exclude paragraphs 14 through 19, and the paragraph I was looking at was paragraph 18. So does that change your answer? So did they rely on, I know they, Novartis changed the focus, and I don't remember, is 18 the paragraph that they changed their mind and wanted you to rely on? Well, this is where he talks about changing proportions, and to me it kind of went to the question of whether all the evidence was just talking about doses or was it talking about proportions or weight percentages. And so I'm just trying to understand. I thought that this evidence was presented through the PTAB and that the PTAB actually considered it and that it was other paragraphs of the Amora Declaration that weren't considered or given much weight by the PTAB. You know, Your Honor, I don't remember those tables and paragraphs that well, so I do apologize. So if you'd like further briefing on that or a letter, we would be pleased to provide it to the court. But Amora's wasn't, it's entirely up to you, Your Honor. But Amora's testimony overall was not weighed heavily  That's sufficient. Thank you. Thank you so much. And eight minutes? Thank you, Your Honor. So starting with Sakai, and then I will certainly talk about the unexpected. Can you start where at least my head is right now? Of course. Can you talk about what the evidence... I'm trying to figure out whether dose meant dose in the usage that it was being given in the supporting declarations and whatnot, or if it actually meant concentration? It meant concentration, and I can tell you why we use the word dose. Actually, I'm more interested in support for the proposition that it meant that by your pointing to a supporting declaration that makes it clear that's the way it was being used than why you did it. Sure, I'll point to two things, Your Honor. The Amora Declaration. Mr. Amora was actually the inventor who figured out this low concentration. What page am I supposed to be looking at? I think it was paragraph 18 or 19. So appendix... I only have... This is 2646? Yes, Your Honor. One moment. I will look at it. The sentence says, Changing proportions normally has no effect on degradation except in circumstances not present here. Such circumstances can involve water-sensitive active ingredients and excipients that attract water to conditions not present in our formula. Right, and there is that. And then, very importantly, attached to Mr. Amora's declaration were the charts showing his binary excipient testing results, which talked about varying the proportion of the excipients. And the reason we use the word dose... I'm sorry. For me, the sentences I just read don't equate low weight percentage with low dosage. Is there something in the record where I can feel like I understand that someone else understood that these two terms are basically interchangeable? Yes, Your Honor. First off, in our patent owner's response at appendix number 7530, so that was our brief, the first brief we followed, we do talk about how the parallels between the dependent claims we were talking about... I'm sorry, 7530? 7530. That can't be right. I think that's our patent owner's response. I got the wrong one. There's no such page between here. You got something different. Okay, so then that must be from the record below, and it must have been omitted in the record. No, it may be here. You just may have the wrong page. Okay, well, I can find the page. I do know, because I wrote it, that there was a paragraph in the discussion of the claims, the specification of the claims, in which we drew an explicit parallel. How about 7350? There you go. Dyslexia struck. Sorry, Your Honor. 7350. Where we draw an explicit parallel between the concentration in the dependent claims and the discovery. The underlying evidence to that... Okay, it's not 7350, but keep going. Okay, we can find it for you, Your Honor. But the underlying evidence for that is in the Ole Moore Declaration, where he talks about how the problem they discovered... He goes through in great detail, but the problem they discovered was they started with a high-dose formulation. Then the preclinical and the clinical folks came back to him and said, we need to lower the dose because we're having some issues. And the formulator said, okay, no problem. And they tried to simply just lower the amount in proportion to the excipients, lower the active ingredient, phengolamide, in proportion to the excipients. And that's when they discovered, all of a sudden, there's this very strange instability group of problems at that moment. And they tried to solve it, as formulators do, by adding stuff into the mix to try to stabilize it. And that didn't work. So where are these attachments, if we can look at them? We're putting our hands on the mirror. Because I guess in just looking at the page that we were discussing before, the paragraph 18 page, the 2646, there are several tables here, table two, table five and six. I'm not seeing, so maybe you can help me see if it's there, that these tables are discussing something about the relative concentration of the active ingredient and the other stuff, or they're just discussing one milligram, five milligrams, et cetera. It's kind of a surprising conflation to use the term dose to talk about concentration. Unless all pills are of a fixed size and the dose is only the active ingredient and then one translates it to the other. The reason that that language crept in, Your Honor, is because of the source of the problem. The original source of the problem was that they had a high-dose formula that had, I think, five milligrams of phengalmon and something like that. And the clinical researchers came back to the formulators and said, we need a lower dose. And that was the starting point. And so what the formulators did is they took that amount of phengalmon and all they did is just lower it, keeping it within the same excipient matrix. And then they discovered, oh my goodness, it's breaking apart. Why? Where is the part of the record that says keeping the amount of excipient that we had when we had, I don't know, five milligrams or whatever, the higher amount of the... It is in the Ulmer Declaration. Okay. Okay. So starting on paragraph 10 of the Ulmer Declaration. Paragraph 10. Which is appendix 2643. Was that excluded? Pardon me? Was that paragraph excluded? I don't recall if it was excluded. I think it was excluded. It was certainly excluded. The board stated that it didn't rely on it. It was certainly excluded. Didn't rely on it. But you haven't appealed. It was excluded. It talks about the initial tests in one to five ratios. And then it shows you in that, you see that chart there? And it's got white lines and the white lines are instances in which phengalmon was stable within the excipient or deemed stable. And then the gray lines are instances in which it was not. And so you also said earlier that your patent owner's response explained how dose really means weight percentage or includes it or something. But I don't see that in your patent owner's response. Could you give us a picture? Yes, Your Honor. Yes. What the patent owner's response did, let me grab it here. What the patent owner's response did is it drew an express parallel between the low concentration dependent claims that we've been discussing and the results that the inventors found when they tried to vary the proportion of phengalmon in the mix. That is... Okay. Okay, so page... That's 7-3-3-0. That's why. 7-3-3-0. Yes, 7-3-3-0. My bad handwriting. Apologies to the court. 7-3-3-0. It calls out how those weight claims are all about the low dose issue. You see the first and second at the bottom there? First, claim one, and then it talks about that's the independent claim. Right. Then it calls out some of the dependent claims, including... But I don't see where it uses the word dose to explain it. It does in the second, where it says... Well, also in first. These include claim eight, including the S1P receptor of 0.5 to 5% of the composition, a low dose range. And then again in second, claim 23, limiting the mixture to 90 to 99.5% mannitol, a low dose formula. That does, am I reading that right, seem to be equating dose with concentration. Exactly right. And then the charts that we relied on in the O'Moore Declaration show the evolution of this understanding by the inventors, where they started at a 1 to 5, and it was stable with a lot, a lot of excipients. And then they moved, and as they went down to 1 to 10, they started seeing increasing instability, which was surprising. That is the unexpected. What I'm wondering is why my understanding of your patent owner response for motion to amend and your referencing to low dosages, those, all those arguments are directed to independent claim 19 or the corresponding amended independent claim in your motion to amend. They, these arguments aren't directing the board to consider this type of unexpected results with the actual dependent claims that recite the particular low weight percentages. That's correct, Your Honor. What we did is focus on specifically claim 19 was really the focus of most of the proceeding. Right. That was the independent claim. And so then, as I understand your unexpected results argument for claim 19 that you presented to the, in your patent owner response,  that what was unexpected is that Fingolimod is stable across the full dosage range. That's correct, Your Honor. And then the board came back and said, okay, you're making this argument about claim 19, which is really kind of a low dosage argument. And the problem with the low dosage argument for claim 19 is it's not commensurate with the full scope of claim 19. So we can't really give it probative weight. But then the next question is, well, it doesn't appear that you made any kind of corresponding argument with the dependent claims in trying to match your unexpected results evidence to those particular claims. Right. Our problem here is that we, as in the page of the patent owner response we were just going over, we called out this relationship between the low concentration instability problem and those dependent claims. Our arguments definitely focused on the arguments that the petitioner focused on, which was all about claim 19. And that is what we focused on. At the, in the motion to amend, we had more specific argumentation about the amended claims that are parallel to these claims. And at the oral argument, there was some discussion of this as well. But when I look at the motion to amend, it's basically the same sentence in the argument for unexpected results. Manitoulin unexpectedly is stable with fengalimate throughout the full dosage range. So it's really the same argument. It's the identical sentence in both the patent owner response and the motion to amend. Right. But of course, the dosage range for the low concentration claims would be a lower dose than for the independent claim. But the key problem that we had with what the board did was that it accepted for purposes of its final written decision the premise that we had made a discovery about low concentration instability of this odd molecule. And then it went on. Where did the board say that? It didn't, it didn't, it didn't. I mean, I know you quoted it twice, but it's actually a little bit misleading of a quote. No, Your Honor, I mean, you quoted, despite agreeing, quote, the stability of the mannitol-fengalimate combination at low doses was unexpected. See, A22, the board found these results not commensurate. But then when you go look at A22, the board says, even if, and then your quoted language, the stability of mannitol-fengalimate combination at low doses was unexpected, it's nevertheless legally insufficient. And Your Honor. Because it doesn't go across the full range of Claim 19. And what I believe the board did is it assumed. So, do you still believe that the board agreed with you? I believe that. That the stability of the mannitol-fengalimate combination at low doses was unexpected? I believe that the board accepted that premise for purposes of its analysis. When it said, even if? I believe that it accepted the premise for purposes of its analysis in its final written decision without ever actually making a final factual determination on the question. So, it didn't agree with you? Well, it agreed with the premise. No, you didn't. It didn't actually make a final final. And so, and then it carried, and then the problem is having accepted that. You want to double down, that's fine. Well, Your Honor, even if, you could use the word arguendo if you'd like as well, it accepted that premise and then did its analysis based on that premise. Put differently, it didn't reject the premise. And that is what we mean. It did not reject it. It didn't need to address the premise. Right, because it felt that there was a commensurability problem. That's exactly right. And our point is that there, with respect to these dependent claims, there is no commensurability problem. They're perfectly commensurate. And when the board came... But you didn't argue the dependent claims with the unexpected results. That's the issue. Well, I understand that, Your Honor. And the question is whether we should have or not. And we didn't have any reason to think that the board wouldn't carry forward reasoning from one claim to the next. The board goes on in its final written decision and talks about each claim separately, one at a time or in small groups. And when it gets to these dependent claims, it doesn't carry forward the reasoning about commensurability that it had used with respect to Claim 19. Because you admitted you were devoting those arguments to Claim 19 along a full-dosage range type of a theory. There's no question, Your Honor. We were certainly focused on that. But we also drew the board's attention to this alternative point, which is that the dependent claims are low-concentration claims. And they go parallel to the discovery. I think I'm about to call this to an end. Do you have a sentence? Understood, Your Honor. If I may, just a second. I just have one brief summary on Sakai because there were a couple of representations made that I just had to address. One was that we did not move to exclude Sakai. That's actually not true. On page 20 of our motion to exclude, we did move to exclude Sakai under Rules 4.2 and 4.3 for reasons that are a mystery to me. That one page of the motion to exclude did not make it into the joint appendix that went to the court. But it is in the record below. And I encourage Your Honors to look at it. And lastly, I just want to circle back to your question about district court proceedings and the law of the case in district court proceedings and how that works. It depends on the type of proceedings. A preliminary injunction is one thing. A finding on a motion to dismiss or a finding on partial summary judgment motion or a partial trial. It depends on the context. And here, the context was they made a finding that formed the basis of them excluding the Sakai-based grounds from the guests. And in that context, we say we're entitled to rely. Thank you very much. Thanks to all counsel. Thank you. Thank you. The case is submitted.